This 9-11 race discrimination case raises numerous causation issues, although the briefs below and the lower court decision spent a lot of time discussing and analyzing the case in terms of pretext, ultimately the question remains whether a reasonable jury could conclude plaintiff's race was a motivating factor in defendant's termination of plaintiff. And I think the easiest way to approach the analysis is to start by addressing the issue of whether defendant's anti-Arab comments were stray remarks or not, as the district court below held. If they were not stray remarks, then I believe the district court's analysis collapses on itself. It's important to look at that comment itself. It's on page 76 of the excerpts of the record. I normally do not read to an appellate court, but this comment is critical. He is told, soon after 9-11, you can't speak Arabic at work, and you can't hang around with your Arabic friends, and all of your channels at home are Arabic channels, and I don't like that. Now, that is not an ambivalent or ambiguous statement. It is an anti-Arab statement, and it demonstrates a discriminatory animus, because it is not a statement of these issues are interfering with your work performance, or the use of this speech is an issue at work. It's, I don't like it, and it's referring to activity away from work, hanging around with friends and your channels. In the context of this case, those are not stray remarks. They are evidence, direct evidence of a discriminatory animus, and we know that, because prior to 9-11, the evidence on the same page, ER-60, I said ER-76, pardon me, that was a deposition page number, it's ER-60. Deposition page 76. On the same excerpt of the record, ER-60, at page 78, he goes, he explains that prior to 9-11, Ms. Drake had not made any issue about him speaking Arabic. She never told me I couldn't speak Arabic at work. Sometimes sitting next to me, she would comment, when she would hear me speaking to a client in Arabic, she would comment, well, great, you speak two languages. She was even amazed that I could switch between the two languages so quickly. And he goes on, she comments about how do you switch your mind from Arabic to English and connect with both conversations. He concludes, after 9-11, all of a sudden, she said, you can't speak Arabic anymore at work. I guess one question I have is, were this an employee about whom there had not been these complaints with respect to his language ability and his performance, it might be a different situation. Does that have any effect here, how we evaluate that remark and the timing of that? I don't think the prior complaints negate the impact of these remarks and the context in which they're in, because she never goes to him about those complaints. The evidence they have is that she, Ms. Drake, is made aware by other team members of these issues. And he works for many, many months before 9-11, and it is never an issue. It is never an issue that she brings to his attention. I thought the other thing, refresh me then, I thought he was told maybe he needs to take some kind of business English and that there were problems with his English. I don't believe that is supported by the record. There is a discussion when he's early on about his desire to take other courses and his desire to including English classes. He doesn't deny that he was interested in improving. The point though, relevance of context, is as to concerns raised by coworkers to Ms. Drake, they're never brought to his attention until after 9-11. It's true with the performance issues regarding quota as well. These are not stray remarks because there is other indicia of discrimination which were not present in the cases where this court has held ambivalent, ambiguous statements unlike these were stray remarks. Here there is other indicia of discrimination, and it goes to, again, how is he treated before 9-11 versus how is he treated afterward? And before, they have all this evidence about he never made his personal quota. Well, to begin with, it's not a quota. It's a personal goal. And that's how it's presented to him, and that's how it was described by Ms. Drake to him. And then the issue is at various times he's not as good as other people. Well, the facts as to how he's treated and what is said about his performance prior to 9-11 are very different. Prior to 9-11, there's not an issue warranting a warning or discipline. Indeed, the evidence from his affidavit is he's only complimented regarding his performance until after 9-11. Remind me again when he started. I believe it's approximately a year. It's 14 months by the time he's terminated. So it would be approximately a year before he's the 9-11. Before 9-11. Yeah. And approximately. I mean, I'm not sure exactly on that, but that's close. Before 9-11, there's no written warning. There is no verbal warning, despite defendants' own policy, progressive discipline policy, to use those. Before 9-11, the only written evaluation he's given in November of 2000, he gets the highest rating possible in proving. In June before 9-11, when defendant asserts he does so poorly against quota, Ms. Drake tells him he's doing a great job. In July before 9-11, he's complimented about winning the July sales contest. In August before 9-11, the month that his performance is so bad that, according to defendant, they decide to put him on a work improvement plan, he's rated second against quota in the entire office. At the time they decide to put or start discussing and decide to put. Was that on one of five criteria? Is that the one where? It is one of five criteria, but their own brief and discussion acknowledges that the August ranking is the precipitating event, if you will. And the problem, I think the fact that the defendant in numerous times in its briefs tries to suggest the decision to put Mr. 11 points to the weakness in their case. The evidence is that the PIP was discussed only after 9-11, mid to late September. They they incorrectly in their brief assert that it was decided before 9-11. And their their citations to that are just absolutely do not support it. The evidence is the PIP is used for the first time by Ms. Drake against our client only after 9-11. And then as to other this other indicia of discrimination, once the 9-11 event has occurred, once she has decided to she's made the anti-Arab comment shortly thereafter, shortly thereafter puts her puts him on the PIP. How does her behavior and treatment of the of the Arab individual, the only Arab individual working for her change? And the evidence is that it changes so drastically. That's Mr. Favara. Pardon me. That's Mr. Favara's word in his affidavit. The evidence is that her treatment of Mr. Aga changes so drastically that it's noticeable to others in the workplace. Another affidavit by Mr. by Ms. Silva, Kim Silva says prior to 9-11, Mr. Ms. Drake only praised Mr. Aga's work performance to others, including Ms. Silva. And next paragraph after 9-11, she was only critical of Mr. Aga. We have it's the change in her behavior is so dramatic, so clear, so drastic that others in the workplace notice it. It's not just Mr. Aga that that senses this. It's not just Mr. Aga that realizes she's changed. It's others in the workplace. Walk with us through the analysis. If you get past the prima facie, they show a well-documented work reason for his termination based on performance and statistics and that sort of thing. So then the burden shifts back to you. Officially shifts in terms of the plaintiff's burden as persuasion production. Exactly. So it's back to you once they've set out this legitimate reason that there's not a pretext. In some cases, we've said, well, the plaintiff hasn't really presented anything more than in the prima facie case. And therefore, summary judgment. How do you analytically place your case at this stage? The post pretext obligation of I present all the evidence I've already discussed is relevant. OK, I don't need an anti-Arab comment to establish the prima facie case. No, I mean, you know, that's additional. That's additional evidence to begin with. We have part of the prima facie case that goes to pretext is the different treatment of the others who are rated below or at Mr. August level in August. There are three others rated at the same level or lower. The evidence is clear that of those three people, one other is terminated. One is terminated. One was longtime had been sick during that great argument to a jury. And one was demoted. Right. Great argument to a jury, Your Honor, that one was sick. But the jury also could believe that one was there. Well, what about the one who was terminated? The one that was terminated is is terminated after Mr. Aga. The one who was terminated is not put on a work improvement plan at the same time as Mr. Aga. That work improvement plan, if it was instituted at all, is instituted after Mr. Aga. Why does Mr. Aga happen first? Why does Mr. Aga happen right after 9-11? Why is the other person that's terminated not put on a work improvement plan at the same time? Why is the other person that the only person that's lower? Why is she allowed to be demoted? Well, there may be a number of reasons, but a reason may be that Mr. Aga was error of his degree of treatment, not that they were exempted. Except for one who was sick. One is exempt and he's sick again. The jury may believe that. Let the jury decide if it's sickness or error. An employer can never overcome that third step. If unless if there is any single individual that you can pick out. No, the single individual must be a similarly situated individual as to relevant terms. OK. The and I'm not saying that that alone is sufficient. I'm saying that in the in the context of all that we have here, that is one more factor that gets us past summary judgment. It is one factor from which a jury could still hold that Mr. Aga's Arabness, not Mr. Favara's sickness, was the difference between their treatment. When you look at all the other factors, there is there is certainly enough evidence. Not certainly. We wouldn't be here if there was certainly. But. But I believe there is enough evidence to to for the jury to reach that conclusion. I want to address one point so that I can address it in rebuttal. Should it come up? There's a there's an issue that is difficult for practitioners that I believe impacted this court. The lower court's decision. And that's the Goodwin standard of substantial, specific and substantial, circumstantial evidence. And I believe that's a heightened evidentiary standard that is improper and and never should have been adopted, frankly. But having been adopted, it certainly is no longer appropriate. After this court's ruling in Costa and more significantly, the Supreme Court's ruling in affirming Costa, the evident the treatment of evidence before this court and in the other court, it it does not distinguish between circumstantial and direct evidence. And the Godwin case needs to be changed so that practitioners are not faced with a heightened standard that may mislead. District court judges, I will reserve unless there's an immediate question on reserve the rest of my time for rebuttal. Please, the court will hand them on behalf of Defendant Pele, Rational Software Corporation. Plaintiff, the decision of the district court below should be affirmed because plaintiff is the only telehealth in the office. He never hit a sales goal, his personal sales goal and whose team never hit its team quota during the 14 months from about August 28, 2000. November 9, 2001, the plaintiff was employed at Rational. The decision should also be affirmed because plaintiff was not treated dissimilarly from similarly situated people. Employees who are tele sales reps who are ranked equally low in the same groups at Rational. My question, my question is this. I would agree with you and I may ultimately agree with you, but I would definitely agree with you because of his sales goals and he hadn't met anything. He did not appear to be a very good employee. However, two things intervene, 9-11 and the rather unfortunate comment made by an employee of Rational Software. We have a variety of stray remark cases in the Ninth Circuit, but on some of them where we've said it's not really a stray remark. For example, calling somebody a dumb Mexican. Why isn't this statement more akin to dumb Mexican than a stray remark such as gray hair? We have a gray hair remarks, you know, about older workers. The comment, the context of the Arabic comment and bear in mind it's one isolated comment that occurred in late September, early October in the context of a conversation about plaintiff's improvement. But the context dates back to the beginning of plaintiff's employment when he volunteered that he, that English was his second language. That he had taken courses to improve his English speaking skills. And the record reflects that that issue was visited or revisited between plaintiff and his manager, Ms. Nora Drake, at a couple of junctures throughout his employment. Then in February of 2001, the field sales rep on plaintiff's account team sent an email to Ms. Drake addressing communication problems that plaintiff had. And that issue was subsequently addressed by Ms. Drake with Mr. August. So there was a context of English communication skills being addressed in that time frame. And then again in June of 2001, Ms. Nancy Crawford who became plaintiff's team, teammate so to speak in April of 2001. Ms. Crawford addressed a number of performance issues with plaintiff, with Ms. Drake regarding plaintiff at that time. And also at that time addressed and discussed the need for a potential performance improvement plan to be put in place for plaintiff. Was there any English language discussion during the June 2000 time frame? I don't recall. I would have to go back and check. One of the points that Mr. August's counsel makes is that even if there had been some English language discussion previously, there certainly hadn't been any in the proximity of this remark. So the remark comes out of the blue. Well, the remark comes in the context of a discussion about plaintiff's performance. And there's testimony in Ms. Drake's, Ms. Drake testified that she was trying to work with plaintiff to help him do a better job of qualifying leads, which translated into everyday English means understand what the customer does and whether the customer has an interest and ability to become, or the potential customer I should say, the lead has the interest and ability to become a customer before a field sales rep makes any time, invest any time and effort in visiting that customer. And in the context of that, Ms. Drake's testimony is that in the context of that conversation, she told a story about how plaintiff spent 10 minutes on the phone trying to sell rational software development tools, which are a fairly sophisticated type of software, to an IT department, which would have no interest in or use for that. And her testimony is that she identified within two minutes of the call that this was a waste of time and it took plaintiff 10 minutes. So in the context of discussing plaintiff's performance, Ms. Drake was attempting to address his ability to qualify leads. Okay, well, I guess I hear that and that makes, I'm not saying it's a pretext explanation, it's a logical explanation, but it is, it's trying to explain that she didn't mean what she said, or at least she didn't mean how most people would hear it. So my question is, does that change at all because of the timing, in other words, 9-11? If 9-11 hadn't happened, we might have an easier case. What effect do you think it is to have 9-11 plus these comments, plus in order to explain away these comments, we need her explanation, doesn't that raise a factual issue? Well, there's two points I want to make, and I'm not getting to them quickly enough, I apologize. Well, why don't you answer my question, and then you can get to any other points you want to make. Well, I have two points in response to your question I'm trying to make, and I'm not getting to them quickly enough. But the first is that because language skills and issues were addressed prior to 9-11, I don't believe that the intervening occurrence of 9-11 is the end of the discussion. The second point to make is that referring to plaintiff's own deposition testimony, plaintiff's own testimony about this incident, I think, demonstrates that this is an isolated, ambiguous comment and therefore a stray remark. Plaintiff says, and I'm going to refer to the supplemental excerpt of record, page numbers, that first his testimony to start with the beginning of the story is that Ms. Drake said, you can't speak Arabic, you can't watch TV, you can't hang out with your Arabic friends. But then he testifies that he immediately spoke with Andy Franklin, the human resources representative, who said that he would go talk to Ms. Drake. Plaintiff testified that after Andy Franklin talked to Ms. Drake, he called the plaintiff and said, and reported that Ms. Drake's comment was directed towards helping plaintiff's English and to practicing his English. Coincidentally or incidentally, and I think significantly, plaintiff elsewhere testifies in his deposition at SCR 44, that understanding a customer needs is critical to success as a telesales rep. So there is a connection that plaintiff acknowledges himself, if only implicitly, that you need to have effective communication skills, you need to be able to understand, and that he understood at the time that that comment was directed towards his English skills, regardless of the specific words used. He also testified that Plaintiff also- Tell me again where to look for his testimony that- SCR 46 to 49. Okay, so he's saying there that he understood the context of her remark after talking to Franklin. Yes. Is that referring to his deposition? Yes, this is plaintiff's deposition testimony. Do you have the deposition page's number for that? I do. SCR 44 is page 58. Okay. And SCR 46, obviously page 79, those were two relevant starting points. The two other pieces of plaintiff's deposition testimony, one other piece of plaintiff's deposition testimony to point to on SCR 52, I apologize, which is page 86 of the deposition, plaintiff testifies that Andy Franklin told plaintiff that he could speak Arabic at work, and that's the same testimony that was given elsewhere by Andy Franklin. And at page SCR 67, which is page 141 of plaintiff's deposition, plaintiff testified that Ms. Drake made no other comments. Elsewhere in his deposition, plaintiff testified that no one else at Rational ever said anything discriminatory or related to his Arabic national origin. And plaintiff testified that Ms. Drake made no other comment related to his Arabic national origin. So the one comment is this one, which plaintiff's own testimony acknowledges was told to him at the time of the comment by Andy Franklin, directed towards his English-speaking skills. So for those reasons, the comment I would submit is clearly isolated and clearly ambiguous and capable of a nondiscriminatory interpretation based on plaintiff's own testimony. Therefore, I submit that the district court below correctly found that that was an isolated, stray remark and not a proper basis for the pretext. What is your response to the argument that the district court may have had a confused idea about the quality of circumstantial evidence versus so-called direct evidence? Referring to the Godwin standard of specific and substantial circumstantial evidence. On that point, Your Honor, I would submit that the first, that the Ninth Circuit standard under Godwin has been, is the correct standard and it is a standard that the Ninth Circuit has continued to apply since Desert Palace. And it's significant that Desert Palace is a mixed motive case, whereas this case has always been and remains a pretext case. And Desert Palace is a jury instruction case, whereas this is a summary judgment case. And the Godwin standard is a summary judgment standard. So at some level, I believe that we're mixing apples and oranges here. Beyond that, however, if the court were to delete the words specific and substantial from the Godwin standard, it would not change the result. Ultimately, it's Supreme Court authority that's going to govern the Godwin standard or any other standard that this court would adopt. And the Supreme Court precedent on summary judgment in pretext discrimination cases and on summary judgment cases generally refuses terms such as specific facts, concrete evidence, significant probative evidence. And I'm referring to the Celotex decision. Well, I've always had trouble with the efforts of courts to evaluate the probative value of different kinds of evidence at summary judgment time, because that's usually the jury's job to decide what what does this prove? What does that prove? And there's no qualitative difference between circumstantial and direct evidence if the circumstantial evidence has good probative value. If I look out the window and I see bare grass out there and the next morning I look out and I see six inches of snow, I didn't see any snowfall, but there's circumstantial evidence that's pretty reliable that it snowed last night. But, Your Honor. What's wrong with circumstantial evidence? There's nothing wrong with circumstantial evidence, Your Honor. And I'm not submitting that a different standard should be applied to circumstantial evidence than direct evidence beyond what the Godwin court suggested. And I'm also suggesting that if you argue that if the Godwin distinction were eliminated and the courts were to look at direct and circumstantial evidence. Maybe it's a distinction that gets us nowhere. I believe that it gets us nowhere because ultimately, in order to survive summary judgment, plaintiff must submit sufficient evidence to. To make a question, isn't it? Not to prove it, but to make a question. Sufficient evidence on which a reasonable juror could find in plaintiff's favor. And I believe that plaintiff has not submitted any such evidence in this case. Plaintiff's argument on pretext is plaintiff has. I just want to follow. You may be going there, but you've addressed the stray remark, but then counsel is stitched together additional indicia. Correct. So it's not just the stray remark, but it's the before, after. It's the dramatic change in attitude picked up by two other employees whose declarations are in the record. So why doesn't that create the fact hook for a jury to reasonably conclude, notwithstanding the explanations that you've well articulated? I will go through all of those now to the extent that I can keep track and remember them all. And if I skip one, feel free to interrupt and ask for an explanation of that. The evidence of different treatment before and after September 11th, I believe, is paper thin. There is plaintiff's bald assertion and there are affidavits submitted by a couple of coworkers that have no detail. They don't describe those coworkers' opportunities to observe before or after. A coworker's observation that before 9-11 she only heard positive comments and after 9-11 she only heard negative comments doesn't tell us anything unless we know that she was following Nora Drake around 24 hours a day, seven days a week and had an opportunity to observe every comment that Nora Drake ever made about the plaintiff. So I don't think that that's compelling. I guess on that point, I kind of put that in the category of a cold shoulder response and I'm not quite sure how that really fits into the discrimination claim. I think that's a fair point as well, Your Honor. In that regard, September 11th was something that impacted everybody regardless of their race. There's testimony from plaintiff, from Ms. Drake, that they were in shock after 9-11. So any change in demeanor wouldn't necessarily be related to an employee's race but could be related to other factors, completely unrelated to plaintiff. The plaintiff has argued that pretext is established by the fact that his performance was complemented before 9-11 by Ms. Drake and not afterwards. The record demonstrates quite clearly that he was criticized before 9-11 and he was complemented by Ms. Drake after 9-11. There are emails from Ms. Drake to plaintiff during the PIP, during October of 2001, complimenting him on doing things well, coaching him, helping to improve and congratulating him when he did something well. The plaintiff has pointed to an alleged first-time use of a performance improvement plan by Ms. Drake as evidence of pretext. There's no evidence to support that representation by plaintiff's counsel. In fact, the evidence, uncontroverted in the record, is that Ms. Drake prepared a performance improvement plan in July of 2001 for Deborah Sturm. When she presented that performance improvement plan to Deborah Sturm in July of 2001, Ms. Sturm quit. Ms. Sturm was ranked in the same group that plaintiff was ranked in in May of 2001 and that PIP was delivered to her in July of 2001. She quit at that time. It's just not true that Mr. Auger represented the first time that Ms. Drake had used a PIP. Furthermore, the August 2001 ranking, which put Kent Ferris in the same group as plaintiff, led to a performance improvement plan for Mr. Ferris and to the termination of Mr. Ferris's employment in November of 2001, the exact same month in which plaintiff's employment was terminated. So there's no evidence in the record to support plaintiff's representation to this court that Mr. Auger was on a faster track to termination than Mr. Ferris was. The only evidence in the record is that they were both put on PIPs after the August ranking and that they were both terminated in November of 2001. In terms of some of plaintiff's other arguments, plaintiff in his papers has submitted that evidence of satisfactory performance was evidence to support his argument of pretext. The plaintiff has admitted that he never hit his goals and he never hit his personal sales quota or the team sales quota. They set their own, each sales set his own goals. The company sets a team quota and 30 to 35 percent, depending on which time frame you're talking about, 30 to 35 percent of the team quota is the telesales rep's personal goal. Plaintiff was hired, also in terms of understanding arguments against pretext, plaintiff was hired by Nora Drake and Jill Cooper in August of 2000. Nora Drake, Jill Cooper, and Andy Franklin terminated plaintiff's employment in November of 2001. So there's the same decision maker element to this analysis and there's also plaintiff's own testimony that Andy Franklin and Jill Cooper were admittedly not acting out of discriminatory animus. Let me ask you, I think their point on the PIP was that he, despite his alleged poor performance, was never put on the PIP program until after 9-11 and after the remark. Does that change anything? In other words, he's not saying that PIPs didn't exist, but he was saying for him it didn't come until after these remarks. So it's a temporal issue. I think the most that can be said about that is that it's an accident of history. It's an accident of timing. Yes, September 11th intervened and yes, Mr. Agha happens to be of Arabic national origin, but the treatment of him was consistent throughout. He was hired in August of 2000. He was given an opportunity to learn the job in ramp up. Then an evaluation was made over a period of time after he had those three to six months to ramp up that he wasn't getting the job done. And in the ordinary course, his ranking in May of 2001 and August of 2001 led to a conclusion that he was the only telesales rep in Beaverton, Oregon during that 14-15 month period who never hit his personal goal and whose team never hit its team quota. There was clearly a need to be addressed and everybody else ranked in the same or lower groups in those May and August 2001 rankings was subject to some form of disciplinary action and either quit after being warned about performance or was put on a performance improvement plan and terminated. And then of course there's the situations of Kristin Shiromonti and Tom Favara that were discussed previously. And I think it's interesting that in Mr. Favara's affidavit there's nothing to address his illness, nothing to address the circumstances of why his performance was not a basis for a performance improvement plan at that time. So, it looks like I'm almost out of time. If you have questions. I think there's no further questions. Thank you. Thank you. As to Ms. Drake's version of the anti-Arab comments being simply a misunderstanding, defendant's position is stated on page 14 of their brief. They cite, they set forth Ms. Drake's explanation that it's a misunderstanding. That exact paragraph is denied in plaintiff's affidavit as inaccurate, incorrect, and not the way it happened. This is summary judgment. They don't get to argue it's a misunderstanding. When my client says they're absolutely inaccurate in their description of that English, of that anti-Arab statement being part of a you need to improve your English language skills. This is not a question of a cold shoulder. This is a question of a dramatic, drastic change as testified to by others. It is a change from Ms. ER-59, plaintiff describing Ms. Drake before 9-11 as the perfect manager, the manager you would want, the type of manager I'd want to work with, easy to communicate with, helpful, helpful to me at the beginning and working with me on accounts. Prior to, it goes on, prior to 9-11, she was like that. She was perfect before 9-11. After 9-11, question, what happened after 9-11? A totally different person. She changed her personality completely. She becomes nervous around him. Nervous is related to the 9-11 situation is exactly the kind of evidence a jury could find impacted her treatment of my client. It's not a cold shoulder. She's sabotaged. She goes from helping him and being available and being the perfect manager to being unavailable, being nervous around him, being not by closing him off. When he went to her for help after being put on the improvement plan, she is unavailable. She doesn't have time for him, or the testimony is that when she says I'll get back to you, she doesn't do that. So she puts him on the plan and then sabotages his accomplishment at meeting those goals. And according to Mr. Favara, she sabotages what others are thinking about his performance once he's on the plan by, in a phone conversation that Mr. Favara overhears, she lies about his performance and his attendance. Ladies and gentlemen of the jury, it was a factor. It may not be the only factor. They may have been concerned about performance and other issues, but none of it came to the fore until after 9-11 when she went from being perfect to being nervous around him, cut off all support, refused to be available, and made the anti-Arab comment. It's a question of fact for the jury to decide. It's an accident of history that all these things have their defense. Their defense to the proximity in time is that it's an accident of history. Well, it may be an accident of history that caused her to change her attitude toward Arabs. But it's not an accident of history that insulates them from liability for having done so. Thank you. Thank you. The case of AGA v. Rational Software is submitted and we will adjourn this morning. In addition, we are submitting the case of Franks v. Myers on the briefs. Thank you. Thank you for your arguments. All rise. This court for this session stands adjourned.
judges: Goodwin, McKeown, Fisher